Opinion issued March 19, 2009








 






In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00546-CV

__________


CHRISTOPHER KNOWLES AND MINA MANN, Appellants


V.


JIMMY D. WRIGHT, Appellees






On Appeal from the 61st District Court

Harris County, Texas

Trial Court Cause No. 2007-02728






O P I N I O N

 Appellants, Christopher Knowles and Mina Mann, challenge the trial court's
rendition of summary judgment in favor of appellee, Jimmy D. Wright, in their suit
against Wright for breach of contract, breach of fiduciary duty, quantum meruit, and
fraud. Knowles and Mann bring four issues for our review. In their first two issues,
Knowles and Mann contend that the trial court erred in granting summary judgment
on their breach of contract claim on the ground that Knowles's oral contract with
Wright was not "sufficiently definite" and in granting summary judgment on their
claim for breach of fiduciary duty arising from a partnership on the ground that
Knowles and Wright had not formed a partnership under Texas law. In their third
issue, Knowles and Mann contend that the trial court erred in granting summary
judgment against Mann on the ground that she, as Knowles's former wife, does not
have standing to sue Wright. In their fourth issue, Knowles and Mann contend that
the trial court erred in granting summary judgment on their claims for quantum
meruit, breach of fiduciary duty arising from a relationship of trust and confidence,
and fraud because Wright did not seek summary judgment on those claims. 

 We affirm in part and reverse and remand in part. 

Factual and Procedural Background

 In their second amended petition, Knowles and Mann alleged that, in 2003,
Knowles, a landman, approached Wright, a friend and business associate, about a
proposed "business plan to exploit the Barnett Shale," a "blanket gas reservoir" in
Texas, and Wright orally agreed to be Knowles's partner in "build[ing] a business
focused on the Barnett Shale." In May 2003, Wright formed Westside Energy, LLP
(the "Westside Partnership") to exploit the Barnett Shale opportunities, and Knowles
and Wright orally agreed that, in consideration for Knowles's presenting the
opportunity to Wright, and in exchange for Knowles's further consulting work,
Knowles would receive 50% of Wright's interests in the business after Wright had
recovered his costs.

 Knowles further alleged that, "[p]ursuant to this business arrangement," he
provided consulting services and the Westside Partnership, with his assistance,
"acquired several leases in the Barnett Shale and developed plans to drill wells and
grow the business." Later in 2003, Wright transferred assets of Westside Partnership,
"primarily the leases and business plan," to Westside Energy Corporation ("the
Westside Corporation"), which had been a "dormant oil and gas company" owned by
Keith Spicklemier, another friend of Knowles. (1) In exchange for the transfer of assets
and an additional $23,000, the Westside Partnership received approximately three
million shares of Westside Corporation stock and another 150,000 warrants to
purchase Westside Corporation stock at 50 cents per share. Wright "repeatedly
promised" Knowles that if he would continue providing consulting services, Knowles
would receive a "substantial boot" of 50% of the Westside Corporation's stock. At
this point, the business plan, as alleged by Knowles, was to grow Westside
Corporation "to get Wright in a position to monetize his stock" in six to nine months. 
Again, Wright stated his promise to give Knowles 50% of his Westside Corporation
shares in exchange for Knowles's continued consulting services from 2004 to 2006. 
 Knowles further alleged that by April 2007, Wright, "through" the Westside
Partnership, (2) owned approximately 3.4 million shares of the Westside Corporation,
which had since become a publicly traded corporation on the American Stock
Exchange. Although, "[p]ursuant to their agreements," Knowles was entitled "to one-half of the shares that Wright and his companies had received in [Westside
Corporation]," Wright, in early 2006, refused to honor "his promise," and, instead,
offered to Knowles "far less than the approximately [1.7 million] shares" owed to
Knowles. 

 Knowles and Mann asserted claims for breach of contract, breach of fiduciary
duty, fraud, and quantum meruit. In support of their contract claim, Knowles and
Mann alleged that Knowles had a legally binding contract with Wright to "share one
half of the business with Knowles" in exchange for Knowles's idea and consulting
services to grow the Westside Corporation. In support of this claim for breach of
fiduciary duty arising from a partnership, Knowles and Mann alleged that Knowles
had formed a partnership with Wright to exploit the Barnett Shale and that, under the
express terms of the partnership, Wright had agreed to share one-half of the operating
business with Knowles in exchange for Knowles's idea and consulting services.

 After answering, Wright filed a summary judgment motion on Knowles's
claims for breach of contract and breach of fiduciary duty arising from a partnership. 
Wright argued that Knowles and Mann's breach of contract claim was barred as a
matter of law because "the alleged oral agreement [was] unenforceable due to a lack
of clear, certain, and definite terms." Wright also argued that Knowles and Mann's
claim for breach of fiduciary duty arising from a partnership was barred as a matter
of law because the parties did not have a fiduciary relationship. Finally, Wright
asserted that Mann had no claims against Wright. Wright attached to his summary
judgment motion both his and Knowles's deposition testimony. Citing to their
testimony, Wright contended that none of the essential terms of the purported
agreement were "clear, certain, [or] definite terms." He asserted that the purported
oral agreement was not definite as to what services Knowles was obligated to
perform, what Wright was required to give Knowles, and when and for how long each
party would be expected to perform his respective obligations. 

 In his response to Wright's motion, Knowles asserted that the summary
judgment record "clearly define[d]" that the parties had orally agreed that, in
consideration for Knowles's presentation of the opportunity to Wright and the
performance of consulting work, Wright promised Knowles "50% of Wright's interest
in the business after Wright had monetized the investment and recovered his cost." 
Knowles contended that their oral agreement "later became more specific when
[Westside Corporation] was identified as the business entity that would be used to
develop the Barnett Shale opportunity, whereby Wright promised Knowles 50% of
his shares of [Westside Corporation] stock as soon as they became transferable." 
Knowles attached to his response his affidavit, in which he testified that in 2003 he
approached Wright "with a plan to develop a business to invest in and exploit the
Barnett Shale," and Wright agreed to the idea and further agreed to be Knowles's
partner. Knowles further testified,

We agreed that, in consideration for my conceiving this idea and then
offering Wright the opportunity to participate, and in exchange for my
further consulting work at a reduced rate of payment, I would receive
fifty percent of Wright's interests in the business after Wright had
recovered his costs. Wright promised to transfer those shares as soon as
they were legally transferable. The initial plan for our partnership was
to purchase lease interests associated with the Barnett Shale and sell
them quickly.


Pursuant to this business arrangement, I provided consulting services to
Wright and [Westside Partnership], including managing the land
department and field personnel, identifying and presenting specific
acreage, refining the business plan, and reviewing potential business
acquisitions. I further negotiated for months with landowners to identify
and acquire leases, conducted title searches, conducted feasibility
studies, helped manage a drilling program, and identified potential
acquisition targets. Under my guidance and assistance, [Westside
Partnership] acquired several leases . . . . [F]rom 2003 through 2006, I
devoted nearly all of my professional time and energy to the project at
a significantly reduced rate of payment. 


Later in 2003, we planned to raise money and drill a small number of
test wells . . . . After establishing their value, we planned to liquidate
the leases and share fifty-fifty the upside of the transactions after Wright
had covered his expense. The partnership initially acquired four leases
in the Barnett Shale. The leases were acquired (through my efforts) in
order to benefit our partnership and were eventually taken in the name
of [Westside Partnership], a limited partnership controlled by Wright.
While we initially planned to flip the leases . . . , we formed a more
lucrative plan shortly thereafter. Pursuant to our new agreement and
plan, Wright transferred [Westside Partnership's] assets (primarily the
leases and business plan) to . . . [Westside Corporation]. In return for
Wright's contribution of the [Westside Partnership's] assets and
approximately $23,000, [Westside Partnership] (Wright's Company)
received approximately 3,059,585 shares of Westside Energy
Corporation Stock and 153,608 warrants . . . . Again, Wright assured
me that if I continued to provide the aforementioned consulting services,
I would receive a "substantial boot" of fifty percent of Wright's
[Westside Corporation] stock. Our goal was to grow [Westside
Corporation] to put Wright in a position to monetize our stock in six to
nine months. [Westside Corporation] later became publicly traded . . . .
As of April 2007, Wright--through his company Westside Resources
(f/k/a Westside Energy) [the Westside Partnership]--owned
approximately 3,435,603 shares of [Westside Corporation's] common
stock. Throughout 2004, 2005, and 2006, Wright continued to
emphasize and promise to me that I would receive one-half of those
shares if I hewed to the plan and kept working. Wright reiterated that
he would transfer my half of the shares as soon as those shares became
transferable. 


. . . . 


We held ourselves out as partners in the [Westside Corporation] to
several parties. 


 Knowles also attached to his response an affidavit from Robert Hinds, an
"advisory consultant" to Westside Corporation, who testified that he had worked with
both Wright and Knowles and that Wright had told him that he and Knowles were
partners and that Knowles would be receiving one-half of Wright's stock in Westside
Corporation when Wright was allowed by the board of directors to transfer his shares. 
Knowles also attached to his response an affidavit from James Hillier, a commercial
business developer acquainted with both Wright and Knowles, who testified that, in
2003 and 2004, he was present during conversations regarding the business plan to
develop the Barnett Shale, Wright told him and Knowles that Knowles would receive
fifty percent of Wright's interest in the "business entity" after Wright had recouped
his investment, and Wright referred to Knowles as his partner. Hillier also testified
that he was present when the parties discussed that Westside Corporation would be
used to develop the leases and acquire acreage, Wright promised Knowles that they
would be "fifty-fifty partners in any shares" of Westside Corporation "received by"
Wright "or his companies," and Wright stated that Knowles would receive the stock
"as soon as it became transferable."

 The trial court granted Wright's summary judgment motion and dismissed the
claims of Knowles and Mann. 

Standard of Review

 To prevail on a summary judgment motion, a movant has the burden of proving
that it is entitled to judgment as a matter of law and that there is no genuine issue of
material fact. Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339, 341 (Tex.
1995). When a defendant moves for summary judgment, it must either (1) disprove
at least one essential element of the plaintiff's cause of action or (2) plead and
conclusively establish each essential element of its affirmative defense, thereby
defeating the plaintiff's cause of action. Cathey, 900 S.W.2d at 341; Yazdchi v. Bank
One, Tex., N.A., 177 S.W.3d 399, 404 (Tex. App.--Houston [1st Dist.] 2005, pet.
denied). When deciding whether there is a disputed, material fact issue precluding
summary judgment, evidence favorable to the non-movant will be taken as true.
Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985). Every
reasonable inference must be indulged in favor of the non-movant and any doubts
must be resolved in its favor. Id. at 549. Moreover, a summary judgment must stand
or fall on the grounds expressly presented in the motion. McConnell v. Southside
Indep. Sch. Dist., 858 S.W.2d 337, 339-41 (Tex. 1993).

Breach of Contract

 In their first issue, Knowles and Mann argue that the trial court erred in
granting summary judgment on their breach of contract claim because Knowles's oral
contract with Wright was not a "best efforts" agreement and was "sufficiently
definite" to be enforced under Texas law. First, Knowles asserts that there was "no
uncertainty" regarding his obligations under the contract. He argues that he was
required to provide much more than his "best efforts" because, under the contract, he
contributed "the initial idea" and his landman expertise while "receiving payments
of about half of prevailing market rates." Knowles negotiated with landowners,
conducted title and feasibility studies, managed a drilling program, and identified
potential acquisitions. Alternatively, Knowles argues that even if the contract was
a "best efforts" agreement, it was still enforceable because the parties had achieved
their goal. Thus, "any analysis" of whether he had contributed his best efforts was
unnecessary and a jury could be asked "to look to the actions that a reasonable deal
originator and land consultant would have taken under similar circumstances to
determine whether Knowles's . . . met that standard." 

 Second, Knowles argues that Wright's obligations under the oral contract were
not indefinite because Wright was specifically required to transfer 50% of the shares
in Westside Corporation "that he or any company controlled by him received" as soon
as they became transferable. Knowles asserts that the stock became transferable 
when either the shares became open to trading on the stock exchange or Wright
terminated his employment with Westside Corporation and sold some of his shares. 
 Whether an agreement fails for indefiniteness is a question of law to be
determined by the court. T.O. Stanley Boot Co., Inc. v. Bank of El Paso, 847 S.W.2d
218, 222 (Tex. 1992); Playoff Corp. v. Blackwell, No. 2-06-249-CV, 2008 WL
5194340, at *3 (Tex. App.--Fort Worth Dec. 11, 2008, no pet.). "In order to be
legally binding, a contract must be sufficiently definite in its terms so that a court can
understand what the promisor undertook." T.O. Stanley Boot Co., Inc., 847 S.W.2d
at 221; see also Lamajak, Inc. v. Frazin, 230 S.W.3d 786, 793 (Tex. App.--Dallas
2007, no pet.) ("For an enforceable contract to exist, the legal obligations and
liabilities of the parties must be sufficiently definite."); Playoff Corp., 2008 WL
5194340, at *3 ("If an alleged agreement is so indefinite as to make it impossible for
a court to fix the legal obligations and liabilities of the parties, it cannot constitute an
enforceable contract."). The material terms of the contract must be agreed upon
before a court can enforce the contract, and "[w]here an essential term is open for
future negotiation, there is no binding contract." T.O. Stanley Boot Co., Inc, 847
S.W.2d at 221; Lamajak, 230 S.W.3d at 793 ("The contract must be certain and clear
as to all essential terms or the contract will fail for indefiniteness."); Liberto v. D.F.
Stauffer Biscuit Co., 441 F.3d 318, 324 (5th Cir. 2006) ("Whether a given term is
'essential' to a contract is a matter of law to be reviewed de novo, a determination
turning largely on the type of contract at issue. . . . ").

 "It is well established that the terms of an oral contract must be clear, certain,
and definite." Gannon v. Baker, 830 S.W.2d 706, 709 (Tex. App.--Houston [1st
Dist.] 1992, writ denied); see also Farone v. Bag'n Baggage, Ltd., 165 S.W.3d 795,
802 (Tex. App.--Eastland 2005, no pet.) ("The terms of an oral contract must be
definite, certain, and clear as to all essential terms; or the contract will fail for
indefiniteness."). "A lack of definiteness in an agreement may concern the time of
performance, the price to be paid, the work to be done, the service to be rendered or
the property to be transferred." (3)
 Gannon, 830 S.W.2d at 709; see also Liberto, 441
F.3d at 324. "The rules regarding indefiniteness of material terms of a contract are
based on the concept that a party cannot accept an offer so as to form a contract
unless the terms of that contract are reasonably certain." Playoff Corp., 2008 WL
5194340, at *3 (citing Fort Worth ISD v. City of Fort Worth, 22 S.W.3d 831, 846
(Tex. 2000)). "Although Texas courts favor validating contracts, we may not create
a contract where none exists." Lamajak, 230 S.W.3d at 793.

 In his deposition testimony, when asked what the oral contract required of him,
Knowles explained that he had promised Wright all of his "best effort" and
"everything else, such as [his] blood, sweat, tears and anything else [he] could come
up with to get it done, avoiding any and all other opportunities." When asked exactly
what he was to direct his best efforts toward, Knowles responded, "Build a business
enterprise of which [he] would share half of." In his affidavit testimony, Knowles
testified that, under the initial oral agreement that he had with Wright, in which the
parties intended to quickly flip leases for a profit, he was charged with conceiving of
the idea, offering Wright the opportunity to participate, and providing "further
consulting work at a reduced rate of payment." However, Knowles offered no
testimony as to what specific services the oral contract actually required of him. In
his affidavit, which is slightly more specific, Knowles described some of the
consulting services that he had in fact provided "pursuant" to their initial business
arrangement. He also stated that, once he and Wright had developed a more lucrative
business plan to build the business rather than quickly flip the leases, he "continued
to provide the aforementioned consulting services." Finally, Knowles testified that
Wright had repeatedly told him that he would receive one-half of those shares if he
"hewed" to the business plan and "kept working." 

 The bottom line is that Knowles did not offer evidence as to what exactly he
was obligated to do and what specific services he was required to provide under this
subsequent oral contract to build a business with Wright--terms essential to the
parties' purported oral contract to build a business and ultimately sell the shares of
that business for profit. See Lamajak, 230 S.W.3d at 793 (stating that "services to be
provided" by party seeking to share in gross profits of business arrangement pursuant
to alleged oral contract "were a material term of the alleged contract," concluding that
there was no evidence that the parties agreed on "certain services" to be provided, and
holding that evidence was legally insufficient to support breach of contract claim). 
This "lack of definiteness" in regard to the work to be done and the services to be
rendered by Knowles under the purported oral agreement is fatal to the claim of
Knowles and Mann for breach of contract. Accordingly, we hold that the trial court
did not err in granting summary judgment in favor of Wright on this breach of
contract claim. 

 On appeal, Knowles argues that Wright has "not offered any argument that
Knowles failed to perform everything that could conceivably be required under their
agreement." This argument, of course, assumes the existence of a binding oral
contract. It would not make sense for Wright, who is contending that the parties
never entered into an oral agreement, to argue that Knowles failed to provide all
services that "could conceivably be required" under the agreement if, in fact, no
specific agreement existed. Knowles also cannot establish the existence of an oral
contract simply by detailing the consulting services that he actually provided during
the parties' business relationship. (4) See Lamajak, 230 S.W.3d at 794 (stating that
although witnesses provided testimony about work one party provided after contract
was allegedly performed, there was no evidence that parties had actually agreed to
"what services" would be provided in exchange for share of gross profits).

 Knowles further argues on appeal that because Wright has more than twenty
years of experience in the oil and gas industry and was "was well aware of the role
of a landman in identifying and negotiating for lease prospects," it "was not
necessary" for the parties to spell out the minutiae of Knowles's "day-to-day activities
in support of the venture." We agree that a contract between Knowles and Wright to
"build a business" with the stated general "goal to monetize investments through the
sale of shares to the public" would not necessarily need to specify Knowles's or
Wright's day-to-day duties. Here, however, the purported oral agreement provided
no terms as to Knowles's specific obligations, i.e., exactly what was required of
Knowles so that Wright could enforce the contract against Knowles. For example,
if we were to recognize the existence of an oral agreement on the evidence submitted
by Knowles, how could Wright ever assert that Knowles breached the agreement by
failing to comply with the terms setting forth Knowles's obligations under the
contract? There simply are no such terms. More significantly, how could a court or
a jury ever make a finding as to whether Knowles complied with the oral contract in
order to award Knowles fifty percent of the shares held by Wright or in a company
"controlled" by Wright? Without evidence of the performance specifically required
under an oral or written contract, a court simply cannot fix the legal obligations and
liabilities of the parties. See Gannon, 830 S.W.2d at 709. In response to Knowles's
suggestion that a jury or court might simply measure his conduct against the conduct
of a reasonable deal originator or landman, (5) there is no evidence that the parties
agreed that Knowles would receive 50% of Wright's interest if he conducted himself
in accordance with these reasonable standards, whatever those standards are and
however those standards would apply to the specific business arrangement here.

 Moreover, even if the purported oral contract set forth sufficiently definite
obligations for Knowles, it failed to provide clear, certain, and definite obligations
for Wright. In his affidavit, Knowles testified that he and Wright initially planned to
flip leases for a quick profit and that, after Wright recovered his costs, Knowles
would be entitled to 50% of Wright's interest in whatever business was ultimately
formed. According to Knowles, the men subsequently modified their original plan,
and, rather than flip the leases as initially planned, the men allegedly agreed to
transfer the Westside Partnership's leases and business plan, along with some cash,
to another company, Westside Corporation, in exchange for approximately three
million shares of Westside Corporation. Knowles testified that, as part of this
modified plan, and in exchange for Knowles's continued "aforementioned consulting
services," Wright had agreed to give Knowles 50% of Wright's Westside Corporation
stock as soon as the stock became transferable. Although Knowles repeatedly
testified that Wright had promised him 50% of his ownership interest in whatever
public entity was formed pursuant to the business plan, it is undisputed that Wright
did not obtain an individual ownership interest in Westside Corporation. Rather, the
shares of Westside Corporation were transferred to Westside Partnership. In an effort
to account for the lack of clarity and definiteness of terms and to explain how he was
to receive his shares under the purported oral contract, Knowles, in his deposition,
testified that the specific terms of the deal were a "moving target," although he never
"expected to work for less than half." The following exchange then occurred:

 [Wright's attorney]: When you say it was a moving target, do you
mean that . . . the terms of the agreement
changed over time?


 [Knowles]: Only the entities. The entities and the
counties and at which stage was going to
happen. It was . . . Keith [Spickelmeir] had
to do a lot of background work, and [Wright]
had to reform things for loans and collateral. 
And it was . . . all over the map. . . .


 In addition to these discrepancies over exactly how Knowles was to acquire
50% of certain shares from Wright, or from companies controlled by Wright,
Knowles's own evidence was not clear, certain, and definite as to when he was to
receive his shares and how his interest was to be calculated. First, Knowles generally
agreed in his testimony that Wright was entitled to recover his "costs" or "expenses"
before calculating the amounts to which Knowles was entitled under the oral contract. 
But as Wright notes on appeal, there is no evidence as to any agreement between the
parties on how to begin calculating those "costs." Although both Wright and
Knowles provided some testimony as to some monetary investments made by Wright
and his companies, Wright testified in his deposition that he worked without
receiving a salary for a period in 2004. It is also undisputed that Knowles received
compensation from Westside Partnership or Westside Corporation for his consulting
services, and the record indicates that there were likely also other employees or
operating expenses that would likely need to figure into any calculation of "costs" or
expenses. Without any evidence as to the parties' specific agreement on what
constituted "costs" and how those "costs" were to be calculated under the purported
oral contract, it would be impossible for a court to determine Wright's liabilities
under the purported contract. 

 Similarly, there is no evidence clearly identifying the time that Wright had to
transfer the shares held by Westside Corporation or the time that Knowles's
obligation to provide services, at a below-market rate, to Wright or to Westside
Partnership and/or Westside Corporation terminated. See Playoff Corp., 2008 WL
5194340, at *4 (stating that evidence showed that "alleged agreement left a material
matter open for future adjustment" and agreement never occurred); Shaw v. Palmer,
197 S.W.3d 854, 856 (Tex. App.--Dallas 2006, pet. denied) (concluding that
summary judgment did not contain evidence of any agreement to pay "sum certain"
as bonus, amount of bonus was indefinite at time of agreement and was open for
future negotiation or discretion, and parties only "had a contingent agreement to
agree"); Farone, 165 S.W.3d at 802 (holding that contract failed for indefiniteness
because there were essential terms upon which there was no agreement). 

 We overrule the first issue of Knowles and Mann.


Breach of Fiduciary Duty Arising from a Partnership

 In their second issue, Knowles and Mann argue that the trial court erred in
granting summary judgment on their claim for breach of fiduciary duty arising from
a partnership because, under the circumstances, Texas law recognizes such a
partnership. 

 Under article 2.03 of the Texas Revised Partnership Act ("TRPA"), there are
five factors to consider in determining whether a partnership has been created. Tex.
Rev. Civ. Stat. Ann. art. 6132b-2.03(a) (Vernon Supp. 2008); Brown v. Swett &
Crawford of Tex., Inc., 178 S.W.3d 373, 378 (Tex. App.--Houston [1st Dist.] 2005,
no pet.). The factors include (1) the receipt or right to receive a share of profits of a
business; (2) the expression of an intent to be partners of the business; (3) the
participation or right to participate in control of the business; (4) the sharing of or
agreement to share losses of the business or liability for claims by third parties against
the business; and (5) the contribution of or an agreement to contribute money or
property to the business. Tex. Rev. Civ. Stat. Ann. art. 6132b-2.03(a). The Texas
Supreme Court has held that, to establish a partnership or joint venture, a plaintiff
must show (1) a community of interest in the venture, (2) an agreement to share
profits, (3) an agreement to share losses, and (4) a mutual right of control or
management of the enterprise. Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d
171, 176 (Tex. 1997); Brown, 178 S.W.3d at 378. However, the Texas Revised
Partnership Act provides that an agreement to share losses by the owners of a
business is not necessary to create a partnership. Tex. Rev. Civ. Stat. Ann. art.
6132b-2.03(c).

 In evaluating Knowles's fiduciary duty claim arising from a partnership, we
note that even Knowles testified that, under his purported oral agreement with
Wright, he was not required to share in any losses of the partnership. According to
Knowles, the financial risk regarding the investment in the partnership was to be
borne solely by Wright. Also, in regard to control, when asked whether he had any
control over the purported partnership, Knowles responded only that he had "input." 
However, Knowles agreed that he did not have any "signatory authority" for the
Westside Partnership and that he did not have any authority to override Wright's
business decisions. Specifically, Knowles testified,

 [Wright's attorney]: If Mr. Wright had decided . . . I'm not going
to sell these leases to [Westside Corporation],
I'm going to keep them in this company, you
didn't have any authority in the company to
override him?


 [Knowles]: That's correct.


 [Wright's Attorney]: Okay. Mr. Wright didn't come to you and
ask your permission to have [Westside
Partnership] sell those four leases to
[Westside Corporation], did he?


 [Knowles]: He didn't ask permission. He just told me he
was doing it.


Although Knowles subsequently testified that he and Wright made decisions together,
Knowles's testimony made clear that he had no control over the purported partnership
and that Wright retained ultimate control over business decisions. 

 Moreover, it is undisputed that Knowles did not contribute any money or
property to the purported partnership. Wright provided the initial financial
investment, and the leases were acquired by Westside Partnership and/or Westside
Corporation. Although Knowles testified that he provided consulting services, the
record demonstrates that Knowles received compensation for those services, albeit
at a reduced rate. Finally, it is true that Knowles testified that there was an oral
contract requiring Wright to give him 50% of the shares held by Wright, or any
corporation controlled by Wright, in exchange for Knowles's consulting services. 
However, as we have held above, this purported oral agreement failed because the
terms regarding the parties' obligations were not sufficiently definite. As noted by
Wright, even Knowles himself testified that he was to receive these shares as
compensation for his consulting services. 

 We conclude that the record establishes as a matter of law the lack of the
existence of a partnership between Wright and Knowles. Accordingly, we hold that
the trial court did not err in granting summary judgment in favor of Wright on the
claims of Knowles and Mann for breach of a fiduciary duty arising from a
partnership.

 We overrule the second issue of Knowles and Mann.

Mann's Standing 

 In their third issue, Knowles and Mann, who is Knowles's former wife, contend
that Mann has standing to pursue recovery of "a share of proceeds of [the] contract
or [the] partnership relationship that were earned in part during the existence" of her
marriage to Knowles. Having held that the trial court did not err in granting summary
judgment in favor of Wright on the claims of Knowles and Mann for breach of
contract and breach of fiduciary duty arising from a partnership, we need not address
the issue of Mann's standing to bring these claims and her arguments that she is
entitled to pursue recovery of "a share of proceeds" from the purported partnership
relationship or contract because such proceeds were earned in part during her
marriage to Knowles. 

 We overrule the third issue of Knowles and Mann.

Additional Claims

 In their fourth issue, Knowles and Mann argue that the trial court erred in
granting summary judgment on their claims for quantum meruit, breach of fiduciary
duty arising from a relationship of trust and confidence, and fraud because Wright did
not seek summary judgment on those claims. Wright agrees that the trial court erred
in granting summary judgment on these claims, which were added after Wright filed
his summary judgment motion and which were not addressed in Wright's summary
judgment motion. Accordingly, we hold that the trial court erred in granting summary
judgment on Knowles and Mann's claims for quantum meruit, breach of fiduciary
duty arising from a relationship of trust and confidence, and fraud. See McConnell,
858 S.W.2d at 339-41(summary judgment must stand or fall on grounds expressly
presented in motion). 

 We sustain the fourth issue of Knowles and Mann.









Conclusion


 We affirm the trial court's judgment entered in favor of Wright on Knowles and
Mann's claims for breach of contract and breach of fiduciary duty arising from a
partnership. We reverse the trial court's judgment entered in favor of Wright on
Knowles and Mann's claims for quantum meruit, breach of fiduciary duty arising
from a relationship of trust and confidence, and fraud, and we remand for further
proceedings consistent with this opinion.



 Terry Jennings

 Justice


Panel consists of Justices Jennings, Keyes, and Higley.

1. Westside Corporation was formerly known as "Eventemp Corporation."
2. Westside Partnership subsequently became Westside Resources LLC, but, for
convenience, we will continue to refer to it as Westside Partnership.
3. Additionally, "[w]ith respect to an oral agreement to transfer stock, terms must state
the specific quantity of shares and the specific price in order to be considered 'clear,
certain, and definite.'" Gannon v. Baker, 830 S.W.2d 706, 709 (Tex. App.--Houston
[1st Dist.] 1992, writ denied) (citing Consol. Petroleum Indus. v. Jacobs, 648 S.W.2d
363, 366 (Tex. App.--Eastland 1983, writ ref'd n.r.e.)).

4. The record contains undisputed evidence that Knowles received compensation for his
consulting services, although Knowles testified that the compensation he received was
below market rates.
5. Knowles suggests that a jury could "simply be required to consider the actions that a
reasonable deal originator and land consultant would have taken under similar
circumstances to determine whether Knowles's contributions met that standard."
Knowles asserts that "Wright has not offered, and cannot offer, any evidence that
Knowles failed to rise to the standard of an average, prudent, comparable deal
originator or petroleum landman."